**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| ASEA/AFSCME Local 52 Health Benefits Trust, individually and on behalf of a class of similarly situated third party payors, | Case No. |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| ST. JUDE MEDICAL, LLC, a Delaware corporation, and ABBOTT LABORATORIES, an Illinois corporation, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff ASEA/AFSCME Local 52 Health Benefits Trust, by its undersigned counsel, individually and on behalf of the below-defined Nationwide Class and Alaska Class, each comprised of similarly-situated third party payors, files this Class Action Complaint against Defendants St. Jude Medical, LLC and Abbott Laboratories (collectively, "Defendants") for their manufacture, sale, and distribution of defective Implantable Cardiac Defibrillator ("ICD") and Cardiac Resynchronization Therapy Defibrillator ("CRT-D") devices, and states the following:

## I.    PARTIES

*Plaintiff*

1.    ASEA/AFSCME Local 52 Health Benefits Trust (the "ASEA Health Trust" or "Plaintiff") is a tax-exempt IRC Section 501(c)(9) Voluntary Employee Benefit Association. The ASEA Health Trust provides healthcare benefits to participants and their eligible family members consisting of permanent and long-term nonpermanent

employees of the State of Alaska General Government Unit covered by a collective bargaining agreement between the State of Alaska and ASEA/AFSCME Local 52. The ASEA Health Trust paid costs for the implantation of Defendants' defective ICDs and CRT-Ds, and may be subject to pay costs associated with their explant and replacement.

*Defendants*

2.       St. Jude Medical, Inc. was a corporation organized and existing under the laws of the State of Minnesota. On January 4, 2017, Abbott Laboratories ("Abbott") completed its acquisition of St. Jude Medical, Inc., pursuant to an Agreement and Plan of Merger, dated April 27, 2016 ("Merger Agreement"), executed by and among Abbott, St. Jude Medical, Inc., and two wholly-owned subsidiaries of Abbott named Vault Merger Sub, Inc. and Vault Merger Sub, LLC.

3.       Abbott completed the acquisition of St. Jude Medical, Inc. through two mergers. First, Vault Merger Sub, Inc., a wholly-owned subsidiary of Abbott, was merged with and into St. Jude Medical, Inc., with St. Jude Medical, Inc. surviving the merger as a wholly-owned subsidiary of Abbott Laboratories (the "First Merger"). Second, promptly after the First Merger, St. Jude Medical, Inc. was merged with and into Vault Merger Sub, LLC, with Vault Merger Sub, LLC surviving the merger as a wholly owned subsidiary of Abbott Laboratories (the "Second Merger" and together with the First Merger, the "Mergers").

4.       Abbot converted each share of St. Jude Medical, Inc. common stock issued and outstanding immediately prior to the First Merger into 0.8708 of an Abbott common

2

share and $46.75 in cash. St. Jude Medical, Inc. shareholders became Abbott shareholders.

5.      Following completion of the Second Merger, Vault Merger Sub, LLC was renamed St. Jude Medical, LLC.

6.      As a result of the completion of the acquisition, January 4, 2017, was the last day that St. Jude Medical, Inc.'s shares were publicly traded.

7.      St. Jude Medical, LLC is a limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business in St. Paul, Minnesota, where it purports to operate its global headquarters. St. Jude Medical, LLC is a wholly-owned subsidiary of its parent corporation, Abbott Laboratories.

8.      As a result of the Mergers, the surviving entity Vault Merger Sub, LLC (later renamed St. Jude Medical, LLC), possessed all the property, rights, privileges, immunities, powers and franchises of St. Jude Medical, Inc. and was subject to all of the obligations, liabilities and duties of St. Jude Medical, Inc.

9.      Pursuant to the terms and effect of the Merger Agreement, St. Jude Medical, LLC is liable as the successor in interest to St. Jude Medical, Inc., and is responsible for the conduct of St. Jude Medical, Inc. as its predecessor in interest.

10.      St. Jude Medical, LLC and its predecessor in interest, St. Jude Medical, Inc., did business throughout the world and throughout the United States, including in the State of Minnesota. The ICD and CRT-D devices manufactured by St. Jude Medical, Inc. were sold throughout the United States and in the State of Minnesota.

11.     Abbott Laboratories ("Abbott") is St. Jude Medical, LLC's parent corporation, organized and existing under the laws of the State of Illinois, with its principal place of business in Illinois. Defendant Abbott does business throughout the world and throughout the United States, including in the State of Minnesota.

12.     **Alter Ego**: Since completion of the Mergers on January 4, 2017, St. Jude Medical, LLC has operated and continues to operate as a mere alter ego and instrumentality of Abbott. Abbott exercised and continues to exercise complete dominion and control over its wholly-owned subsidiary St. Jude Medical, LLC. Because of the manner in which St. Jude Medical, LLC and Abbott operate as a single, unified enterprise, the distinction between St. Jude Medical, LLC must be disregarded and Abbott held liable for the acts complained of herein.

13.     In addition, upon information and belief, between execution of the Merger Agreement and completion of the Mergers, Abbott exercised dominion and control over St. Jude Medical, LLC's predecessor in interest, St. Jude Medical, Inc., in its device recall efforts, and operated as a mere alter ego and instrumentality with respect to decisions affecting the recall efforts such that, for these reasons, corporate separateness must be disregarded.

14.     It would be offensive to the interests of justice to allow Abbott, who, upon information and belief, played a role in directing the investigation and recall of St. Jude Medical, Inc.'s defective ICD and CRT-D devices, and who has acted for and controlled St. Jude Medical, LLC with respect to the management of its defective ICD and CRT-D

device recall efforts and interactions with the FDA, to shift all liability to St. Jude Medical, LLC.

15.     **Successor**: Upon information and belief, Abbott is a de facto successor to St. Jude Medical, Inc. as Abbott is engaged in a substantial continuation of St. Jude Medical, Inc.'s business as set forth in detail below. There is a continuity of the business enterprise between St. Jude Medical, Inc. and Abbott, including the continuity of management, employees, business location, and assets. There is a continuity of shareholders between Abbott and St. Jude Medical, Inc., as St. Jude Medical, Inc. shareholders became Abbott shareholders at the completion of Abbott's acquisition of St. Jude Medical, Inc. Additionally, St. Jude Medical, Inc. has ceased all operations. Upon information and belief, Abbott has assumed those liabilities and obligations necessary for the uninterrupted continuation of St. Jude Medical, Inc.'s business operations, including the manufacture, sale, and distribution of ICD and CRT-D devices and communications with the FDA regarding the same.

16.     Upon information and belief, at all times herein mentioned, Defendants' employees, subsidiaries, affiliates, and other related entities, as well as the employees of each of each individual Defendant's subsidiaries, affiliates, and other related entities, were Defendants' agents, servants, and employees and, at all relevant times, were acting within that purpose and scope. Whenever this Complaint refers to any act or transaction of either or both Defendants, such designations shall be deemed to mean that Defendants' principals, officers, employees, agents, and/or representatives committed, knew of,

performed, authorized, ratified, and/or directed such transactions on Defendants' behalf while actively engaged in the scope of their duties.

## II. JURISDICTION AND VENUE

17.    This Court has original jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). The aggregated amount in controversy in this action exceeds $5,000,000, and "any member of a class of plaintiffs is a citizen of a State different from any defendant." Plaintiff is a citizen of Alaska and Defendants Abbott and St. Jude Medical, LLC are citizens of Illinois and Minnesota.

18.    This Court has personal jurisdiction over Plaintiff because Plaintiff submitted to this Court's jurisdiction.

19.    This Court has personal jurisdiction over Defendant St. Jude Medical, LLC because St. Jude Medical, LLC's principal place of business is at 1 Saint Jude Medical Drive in Saint Paul, Minnesota.

20.    This Court has personal jurisdiction over Abbott because it acquired St. Jude Medical, LLC's predecessor in interest St. Jude Medical, Inc., which is now a wholly-owned subsidiary of Abbott. Abbott directs its activities toward this jurisdiction, in that it exercises complete dominion and control over its wholly-owned subsidiary St. Jude Medical, LLC in Minnesota.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.  Plaintiff previously brought suit against both St. Jude Medical, LLC, and Abbott in Illinois, and the United States District Court for the Northern District of Illinois dismissed that case without prejudice because "it is. . . apparent that a substantial part of the events or

omissions giving rise to [Plaintiff's] claim did not occur in Illinois." *ASEA/AFSCME Local 52 Health Benefits Trust v. Abbott Laboratories, et al.*, No. 17-cv-06704, ECF No. 50 (June 18, 2018).  Plaintiff brings this suit here, because it is the only other venue where a substantial amount of the events described herein could have occurred. Furthermore, St. Jude Medical, LLC's headquarters is located in this District, and Abbott focused its conduct and communications toward this District as it relates to the facts as alleged herein.

## III.   INTRODUCTION

22.    This is a proposed nationwide class action lawsuit brought on behalf of third party payors ("TPPs"),[1] each of which sustained economic injuries caused by defective ICD devices and CRT-D devices manufactured and sold by St. Jude Medical, Inc., and recalled on or about October 10, 2016.

23.    St. Jude Medical, Inc. manufactured a variety of medical devices designed to treat cardiac conditions, including ICDs and CRT-Ds. ICD and CRT-D devices provide pacing therapy to support slow heart rhythms, and electrical shock or pacing therapy to treat fast heart rhythms.

24.    St. Jude Medical, Inc. received FDA approval to manufacture, market, and sell several models of ICDs and CRT-Ds, including the Fortify™, Fortify Assura™, Quadra Assura™, Unify™, Unify Assura™ and Unify Quadra™ models. These models of St. Jude Medical, Inc.'s ICDs and CRT-Ds are powered by lithium-based batteries.

---

[1] A term used to refer to any company that acts as the payor under coverage provided by a health care plan, each of which bears the risk for covering, among other things, medical device expenses.

25.     In October 2016, the Food and Drug Administration ("FDA") issued a Class I recall of certain models of St. Jude Medical, Inc.'s ICDs and CRT-Ds due to a battery defect, which can cause the batteries in those devices to deplete suddenly and prematurely (the "Battery Depletion Defect"). The defect is caused by deposits of lithium, known as "lithium clusters," which can form within the battery and create abnormal electrical connections that cause the battery to short circuit, leading to rapid battery failure.

26.     The recall implicated hundreds of thousands of devices in St. Jude Medical, Inc.'s Fortify™, Fortify Assura™, Quadra Assura™, Unify™, Unify Assura™, and Unify Quadra™ ICD and CRT-D lines (collectively "the Recalled Devices"), including 251,346 devices sold in the United States alone, and 398,740 devices sold worldwide.

27.     If the battery unexpectedly runs out on one of the Recalled Devices due to the Battery Depletion Defect, the device becomes unable to deliver life-saving pacing or shocks, which could lead to serious health consequences, including death.

28.     St. Jude Medical, Inc. knew of the Battery Depletion Defect as early as 2011, but failed to take action to investigate and report this known risk, *instead waiting nearly five years before issuing a recall of the defective devices*. St. Jude Medical, Inc.'s knowledge of the defect and concomitant failure to act is evidenced by the following facts:

- St. Jude Medical, Inc. received evidence from its battery supplier, as early as 2011, that lithium cluster bridging was causing its device batteries to prematurely deplete. Despite this evidence, St. Jude Medical, Inc. neither

reported nor investigated the issue, and, instead, represented that the cause of the battery depletion "could not be confirmed."

- Between 2011 and 2014, St. Jude Medical, Inc. reviewed 42 product reports showing evidence of premature battery depletion due to lithium cluster bridging; yet failed to take action commensurate with this risk.

- By 2014, St. Jude Medical, Inc. had received notice that premature battery depletion of one of its ICDs caused at least one patient's death.

- In December 2014, a study published in a medical journal determined that lithium cluster bridging was causing premature battery depletion in St. Jude Medical, Inc.'s ICDs and CRT-Ds.

29.     Despite the extensive evidence, and its clear knowledge of the premature battery depletion problem in its devices, St. Jude Medical, Inc. failed to take prompt action, and knowingly ignored or concealed this evidence from its management boards, from the FDA, and from the public, including Plaintiff and the other Nationwide and Alaska Class members.

30.     On November 11 and 12, 2014, St. Jude Medical, Inc.'s management review and medical advisory boards were given two separate presentations on premature battery depletion. During these meetings, St. Jude Medical, Inc. failed to fully disclose the full scope of the battery issue, presented false or incomplete evidence of the defect, and concealed evidence of a known death related to this battery defect stating instead that there were no serious injuries or deaths directly related to lithium cluster bridging.

31.     St. Jude Medical, Inc. also concealed the Battery Depletion Defect from the FDA, medical providers, TPPs, and patients for years, putting hundreds of thousands of its device users at severe risk. As a result, St. Jude Medical, Inc. allowed thousands more defective devices to be implanted in patients across the United States at the Nationwide and Alaska Class members' expense. Even today, St. Jude Medical, Inc.'s successors in interest refuse to pay for removal and replacement of the defective devices.

32.     St. Jude Medical, Inc. ignored and concealed the Battery Depletion Defect for five years until, on information and belief, it was compelled to further investigate the issue by Abbott. Merger talks between Abbott and St. Jude Medical, Inc. took place in March-April 2016, wherein Abbott conducted a due diligence review of St. Jude Medical, Inc. Immediately following Abbott's due diligence review, St. Jude Medical, Inc. instigated new investigations into the cause of the Battery Depletion Defect. As a result of the new 2016 investigations, lithium cluster bridging was identified as the root cause and a decision was made to recall the affected devices. Throughout this investigation and recall, Abbott and St. Jude Medical, Inc. were in the process of completing their merger.

33.     As a result of the Battery Depletion Defect, and St. Jude Medical, Inc.'s concealment thereof, Nationwide and Alaska Class members bought defective devices and patients with a Recalled Device have had to undergo the invasive, dangerous, and expensive process of having their defective devices explanted and replacement devices implanted.

34.     The overwhelming economic impact of Defendants' conduct has fallen, wrongfully, on the shoulders of public and private health insurance payors—such as

Plaintiff and the other Nationwide and Alaska Class members—who (1) paid for defective devices and/or (2) were and are responsible for the explant and replacement costs of the defective devices.

35.     As alleged herein, the economic injuries sustained by Plaintiff and the other Nationwide and Alaska Class members were directly and proximately caused by St. Jude Medical, Inc.'s failure to comply with FDA and federal requirements and regulations, including its failure to timely disclose the Battery Depletion Defect to the FDA.

36.     By not notifying the FDA earlier, St. Jude Medical, Inc. caused Plaintiff and the other Nationwide and Alaska Class members to spend hundreds of millions of dollars needlessly paying for implants (and, subsequently, explants) of known, defective medical devices.

37.     At all times relevant to this action, St. Jude Medical, Inc. knew or should have known that the now-recalled ICDs and CRT-Ds were defective, unreasonably dangerous, and unfit for their intended use. St. Jude Medical, Inc. placed thousands of patients (including TPP participants) unnecessarily at risk and caused Plaintiff and the other Nationwide and Alaska Class members to incur substantially greater costs than they should and otherwise would have paid for medical treatment of their participants. These costs will mount, and Nationwide and Alaska Class members will continue to pay for the consequences of its actions for years to come.

38.     Plaintiff, individually and on behalf of the other Nationwide and Alaska Class members, seeks to recover damages caused by Defendants' wrongful conduct and for declaratory and injunctive relief.

## IV.   FACTUAL BACKGROUND

### A.   Implantable Cardiac Defibrillators

39.     Defendants design, manufacture, market, and sell ICDs and CRT-Ds.

40.     An ICD is a small device that is surgically placed in a patient's body to treat irregular heart rhythms, known as arrhythmias. ICDs operate by using electrical pulses or shocks to control life-threatening arrhythmias. The shock is sent to the heart muscle to interrupt the rhythm disorder and to allow the heart to resume its normal rhythm.[2]

41.     A CRT-D is also used to treat and control arrhythmias. The CRT-D is implanted in a patient's body. Three wires (leads) connected to the device monitor the heart rate to detect heart rate irregularities. The device then emits tiny pulses of electricity to correct any irregularities.[3]

42.     St. Jude Medical, Inc. designed, manufactured, marketed, and sold several different models of ICDs and CRT-Ds, including the Fortify™, Fortify Assura™, Quadra Assura™, Unify™, Unify Assura™ and Unify Quadra™ model lines, which were recalled in October 2016 due to a battery-related defect with the devices (the "Recalled Devices," as defined above).

---

[2] *Implantable Cardioverter Defibrillator (ICD)*, Am. Heart Ass'n, http://www.heart.org/HEARTORG/ Conditions/Arrhythmia/PreventionTreatmentofArrhythmia/Implantable-Cardioverter-Defibrillator-ICD_UCM_448478_Article.jsp#.WYS75BWrphE (Sept. 2016).

[3] *Cardiac Resynchronization Therapy (CRT)*, Am. Heart Ass'n, http://www.heart.org/HEARTORG/ Conditions/HeartFailure/Cardiac-Resynchronization-Therapy_UCM_452920_Article.jsp#.WYS8cRWrphE (Apr. 6, 2015).

43.     At all times material hereto, St. Jude Medical, Inc. developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective Recalled Devices, either directly or indirectly, to members of the general public throughout the United States.

*Images of a Fortify Assura VR ICD, and a Quadra Assura CRT-D*

 

## B.     Regulatory Approval Process

44.     The Medical Device Amendments of 1976 ("MDA") to the Food, Drug, and Cosmetic Act ("FDCA") established the current regulatory framework for medical device approval for devices such as the Recalled Devices.

45.     The MDA contains a three-class classification system for medical devices. Class I devices pose the lowest risk to consumers' health, and include devices such as tongue depressors or bandages. Class I devices receive the least FDA oversight. Class II devices pose intermediate risks to consumers, and require more comprehensive FDA approval, which often includes special controls, including post-market surveillance and guidance documents. Finally, Class III devices pose the greatest risk of death or complications and include most implantable surgical devices such as cardiac pacemakers, coronary artery stents, automated external defibrillators, and several types of implantable

orthopedic devices for spine and hip surgery. Class III devices are subject to the most extensive FDA oversight. The Recalled Devices are Class III devices.

46.    Under Section 515 of the MDA, manufacturers such as Defendants seeking to market Class III devices are required to submit a pre-market approval application ("PMA") to the FDA.[4] During the PMA process, the manufacturer must provide the FDA with "reasonable assurance" that the device is both safe and effective for its intended use.[5] Not only is the design and manufacturing subject to review, but the labeling and packaging are subject to review as well.[6]

47.    After a device receives PMA approval, the FDCA requires medical device manufacturers to comply with all device-specific regulations and standards set forth in the device's PMA.[7]

48.    A medical device is deemed "adulterated" if the "methods used in, or the facilities or controls used for, its manufacture, packing, storage, or installation are not in conformity" with applicable federal requirements.[8] Additionally, if a manufacturer fails to disclose all material facts or comply with reporting requirements, the device is considered "misbranded."[9] The distribution of an "adulterated" or "misbranded" medical device is prohibited, pursuant to 21 U.S.C. § 331(b).

---

[4] 21 U.S.C. § 360e.

[5] 21 U.S.C. § 360e(d); 21 C.F.R. § 814.20.

[6] 21 C.F.R. § 814.20(b).

[7] 21 C.F.R. § 814.80.

[8] 21 U.S.C. § 351(h).

[9] 21 U.S.C. § 352(t).

49.     After PMA approval, device manufacturers must also comply with the

FDA's current good manufacturing practices ("CGMPs"), set forth at 21 C.F.R. §§ 820.1

– 820.250, which "govern the methods used in, and the facilities and controls used for,

the design, manufacture, packaging, labeling, storage, installation, and servicing of all

finished devices intended for human use."[10] A device is deemed adulterated if it is not

manufactured in accordance with CGMPs.[11]

50.     The FDCA provides that a medical device is misbranded if, among other

things, the labeling did not contain adequate directions for use, or the manufacturer failed

to provide information about adverse events.[12]

51.     After the FDA approves a PMA submission, the manufacturer must obtain

FDA permission if it wishes to make any additional changes that affect the device's

safety, effectiveness, or labeling.[13] To obtain FDA permission to make those changes, a

manufacturer must submit an application for supplemental premarket approval,[14]

evaluated under criteria similar to those used in the PMA process.

**C.     Approval of the St. Jude ICDs and CRT-Ds**

52.     In 2004, St. Jude Medical, Inc. received approval to market the St. Jude

Medical® Epic™ HF System and the St. Jude Medical® Atlas® + HF System CRT-Ds.

Since that time, St. Jude Medical, Inc. has designed, manufactured, marketed, and sold

---

[10] 21 C.F.R. § 820.1.

[11] 21 U.S.C. § 351(h); 21 C.F.R. § 820.1(c).

[12] 21 U.S.C. § 352(f), (t).

[13] 21 U.S.C. § 360e(d)(5)(A)(i).

[14] 21 U.S.C. § 360e(d)(5).

several models of ICDs and CRT-Ds, including the Fortify™, Fortify Assura™, Quadra Assura™, Unify™, Unify Assura™ and Unify Quadra™ models. The Fortify™, Fortify Assura™, Quadra Assura™, Unify™, Unify Assura™ and Unify Quadra™ devices were based on the original 2004 PMA submission and numerous supplements.

53.     The FDA-approved PMA imposes specific requirements a manufacturer must follow for the design, manufacturing, labeling, and sale of a PMA-approved device.

54.     The PMA documents, including all specifications, are confidential.[15] As a result, the FDA's device-specific requirements for the Recalled Devices are presently unknown to Plaintiff, and can only be obtained through discovery.

55.     The FDA's Center for Devices and Radiological Health, which reviews PMA submissions for ICD and CRT-D devices does not, and did not, evaluate information related to contract liability warranties in the PMA review and approval process.[16] Any such warranty statements the Defendants made must be truthful, accurate, and not misleading.

**D.     Post-Approval Continuing Requirements, Including General Reporting Requirements to the FDA Mandated by Federal Regulations.**

56.     A medical device manufacturer's obligations do not end with the PMA approval process. Under federal law, a medical device manufacturer has a continuing duty to monitor the product after premarket approval and to discover and report to the FDA any

---

[15] 21 C.F.R. § 814.9.

[16] PMA Approval Letter to Elisabeth E. Neely, RCA, St. Jude Medical, Inc. from the FDA, re: P030054 (June 30, 2004), at 2.

complaints about the product's performance and any adverse health consequences of which it became aware and that are, or may be, attributable to the product.[17]

57.     Even after PMA approval, manufacturers are required to report to the FDA when the manufacturer receives, or otherwise becomes aware, of information, from any source, that reasonably suggests that its device may have caused or contributed to death or serious injury or if the device has malfunctioned and is likely to cause or contribute to a death or serious injury if the malfunction were to recur.[18]

58.     A medical device manufacturer is required to report adverse events associated with the use of the product, including deaths and serious injuries that the device has or may have caused or contributed to and certain device malfunctions. These reports help the FDA "to protect the public health by helping to ensure that devices are not adulterated or misbranded and are safe and effective for their intended use."[19]

59.     Manufacturers must report to the FDA all information reasonably known to the manufacturer, including any information that can be obtained by analysis, testing, or other evaluation of the device, and any information in the manufacturer's possession.[20]  In addition, manufacturers are responsible for conducting an investigation of each adverse event, and must evaluate the cause of the adverse event.[21] Manufacturers are required to

---

[17] 21 C.F.R. §§ 803.1, *et seq.*

[18] 21 C.F.R. § 803.50(a).

[19] 21 C.F.R. § 803.1; 21 U.S.C. § 360i(a).

[20] 21 C.F.R. § 803.50(a); 21 C.F.R. § 803.52.

[21] 21 C.F.R. § 803.50(b)(3).

submit supplemental or follow-up reports if the manufacturer subsequently obtains information that was not available or not known when submitting the initial report.[22]

60.     Medical device manufacturers are required by federal regulation to "establish and maintain" adverse event files.[23]  Pursuant to federal regulations,  medical device manufacturers must also describe in every individual adverse event report whether remedial action was taken with regard to the adverse event, and whether the remedial action was reported to the FDA as a removal or correction of the device.[24]

61.     In addition, medical device manufacturers are required to make periodic reports to the FDA regarding approved devices, and inform the FDA of new clinical investigations or scientific studies concerning the device about which the manufacturer knows, or reasonably should know.[25]

62.     After receiving information on adverse events from manufacturers, the FDA publishes adverse events and medical device reports in a publicly searchable database called the Manufacturer and User Facility Device Experience ("MAUDE"). Physicians and the general public may access MAUDE to view safety data on medical devices.

63.     The Medical Device Reporting requirements are one of the key post-market surveillance tools that the FDA uses to monitor device performance and safety, and the

---

[22] 21 C.F.R. § 803.56.

[23] 21 C.F.R. § 803.1(a).

[24] 21 C.F.R. § 803.52.

[25] 21 C.F.R. § 814.84 (b)(2)

FDA uses this information to "detect potential device-related safety issues, and contribute to benefit-risk assessments of these products."[26] The FDA can revoke its approval based on the manufacturer's post-approval reports.[27]

**E.     Post Approval, the FDA, By Its Regulations and PMA Process, Requires a Manufacturer to Follow Good Manufacturing Practices.**

64.     After receiving PMA approval, medical device manufacturers, like St. Jude Medical, Inc. and the Defendants, must comply with the FDA's regulations on manufacturing processes. Under 21 C.F.R. §§ 820, *et seq.* of the Quality System (QS) Regulation for Medical Devices, the FDA has set forth current good manufacturing practice ("CGMP") requirements. These regulatory requirements apply to manufacturers and govern the methods used in, and the facilities and controls used for, the manufacturing, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use. These requirements are intended to ensure that finished devices will be safe and effective and otherwise in compliance with the FDCA.[28]

65.     21 C.F.R. § 820.5: "Quality Systems," the FDA regulations state, "Each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device(s) designed or manufactured, and that meets the requirements of this part."

---

[26] Medical Device Reporting (MDR), FDA, https://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm (Nov. 7, 2016).

[27] 21 U.S.C. §§ 360e(e)(1), 360h(e).

[28] 21 C.F.R. § 820.1(a).

66.     21 C.F.R. § 820.3(z)(2): "Design validation means establishing by objective evidence that device specifications conform with user needs and intended use(s)."

67.     21 C.F.R. § 820.22: "Quality Audit" states: "Each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system." Reports of each quality audit must be provided to management.

68.     21 C.F.R. § 820.160(a): "Distribution" states: "Each manufacturer shall establish and maintain procedures for control and distribution of finished devices to ensure that only those devices approved for release are distributed . . . ."

69.     21 C.F.R. § 820.30: "Design controls" states: "Each manufacturer of any class III . . . device[] . . . shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met."

70.     21 C.F.R. § 820.50: "Purchasing controls" states: "Each manufacturer shall establish and maintain procedures to ensure that all purchased or otherwise received product and services conform to specified requirements."

71.     21 C.F.R. § 820.70: "Production and process controls" states: "Each manufacturer shall develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications."

72.     21 C.F.R. § 820.90: "Nonconforming product" states: "Each manufacturer shall establish and maintain procedures to control product that does not conform to specified requirements."

73.     21 C.F.R. § 820.100: "Corrective and Preventive Action" requires that each manufacturer establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for analyzing quality audit reports and quality data to identify existing and potential causes of nonconforming product, investigating the cause of nonconformities, and taking corrective and preventive action to ensure that such quality problems do not adversely affect the finished device.

F.     **The Defective Battery in Defendants' Recalled Devices**

74.     Defendants' ICD and CRT-D devices rely on lithium batteries for their operation. These ICD and CRT-D devices are designed to deliver a gentle vibratory alert to the patient when the battery is nearing its end of life.

75.     Upon information and belief, St. Jude Medical, Inc. advertised that all of its ICD and CRT-D devices, including the Recalled Devices, were designed with battery chemistry that provides for enhanced or "extended longevity."[29] For example, St. Jude Medical, Inc.'s website maintained that "the battery is specially designed to power your device for a long time." St. Jude Medical, Inc.'s website also maintained that the company had a "commitment to safe, reliable and effective" ICDs and CRT-Ds. Further,

---

[29] *See, e.g.*, *ICD Devices*, St. Jude Medical, https://www.sjm.com/en/professionals/featured-products/cardiac-rhythm-management/icd-devices (Aug. 16, 2016); *Product Catalog: Fortify Assura™ DR*, St. Jude Medical, https://www.sjm.com/en/professionals/resources-and-reimbursement/technical-resources/cardiac-rhythm-management/implantable-cardioverter-defibrillator-icd-devices/dual-chamber/fortify-assura-dr-dual-chamber-implantable-cardioverter-defibrillator-icd (Apr. 19, 2013); *Product Catalog: Quadra Assura™*, St. Jude Medical, https://www.sjm.com/en/professionals/resources-and-reimbursement/technical-resources/cardiac-rhythm-management/cardiac-resynchronization-therapy-crt-devices/crt-defibrillator/quadra-assura-cardiac-resynchronization-therapy-defibrillator-crt-d (Apr. 19, 2013).

St. Jude's website stated that "whether you can feel [them] or not," the ICDs and CRT-Ds were "doing [their] work."

76.     The batteries used in the Recalled Devices were manufactured by Greatbatch Medical (renamed Integer Holdings, Inc. last year). Greatbatch Medical is a company that manufactures lithium batteries for use in ICD and pacemaker devices. The Recalled Devices all used Greatbatch battery model number QHR2850 (the "Greatbatch Battery").

77.     The Greatbatch Battery used in Defendants' Recalled Devices has a defect that can cause the battery to deplete prematurely. Deposits of lithium, known as "lithium clusters" can form within the battery and create abnormal electrical connections that cause the battery to short circuit. This defect leads to rapid battery failure.

78.     Lithium cluster formation is a known phenomenon with lithium batteries. It is also known that lithium clusters may change size, shape, or location within the battery, and may become dislodged during usage, handling, and/or testing.

79.     In some cases it was reported that full battery drainage could occur within a day or a few weeks after the patient receives the gentle vibratory alert. After the battery is depleted, the device is unable to provide life-saving pacing and shock therapy to the patient.

80.     Additionally, because the battery depletion may occur rapidly, some patients may be unable to detect the device alert before full battery drainage occurs.

81.     As early as 2011, St. Jude Medical, Inc. received reports from its supplier that the batteries used in in its ICD and CRT-D devices could deplete prematurely.[30]

82.     In December 2014, a study published in the journal *HeartRhythm* reported cases of battery failure in St. Jude Medical, Inc.'s Fortify ICDs. The study attributed the failure to the presence of lithium clusters that form in the battery and cause a short circuit and high current drain.[31]

## G.     St. Jude Medical, Inc. Knew of the Battery Depletion Defect as Early as 2011, But Concealed the Defect

83.     St. Jude Medical, Inc. had repeated notice of the Battery Depletion Defect as early as 2011, but ignored and concealed it.

84.     St. Jude Medical, Inc. received returned devices that had experienced battery failure. St. Jude Medical, Inc. examined these returned devices and conducted a failure analysis of the devices as part of its Complaint Handling process. For each returned device, St. Jude Medical, Inc. examined the battery to identify the cause of the premature battery depletion. St. Jude Medical, Inc. also sent batteries to Greatbatch for additional battery analysis. St. Jude Medical, Inc.'s analysis, along with Greatbatch's

---

[30] Warning Letter from FDA to Mike Rousseau, President, Abbott, Neurovascular and Neuromodulation (Apr. 12, 2017) (hereinafter "FDA Warning Letter to Abbott").

[31] *See* Sean D. Pokorney, MD, MBA, Ruth Ann Greenfield, MD, Brett D. Atwater, MD, James P. Daubert, MD, FHRS, Jonathan P. Piccini, MD, MHS, FHRS, *Novel mechanism of premature battery failure due to lithium cluster formation in implantable cardioverter-defibrillators*, HeartRhythm, Volume 11, Issue 12, 2190 – 2195 (Dec. 2014).

findings, were documented in Product Analysis Reports within St. Jude Medical, Inc.'s

Complaint Handling system.[32]

85.     ***Between 2011 and 2014, forty-two (42) of the Defendants' Product***
***Analysis Reports, confirmed that there was an issue with premature battery depletion***
***caused by lithium cluster bridging in the Recalled Devices***. These Product Analysis

Reports included ample evidence and analysis from the battery supplier that the cause of

premature battery depletion was lithium cluster bridging. Despite this evidence, St. Jude

Medical, Inc. ignored the issue and repeatedly concluded that the cause of premature

battery depletion "could not be determined."[33]

86.     St. Jude Medical, Inc.'s practice of designating battery failure as

"confirmed" or "unconfirmed" confounded the decision making processes, as it de-

emphasized the severity of the issue. St. Jude Medical, Inc. compounded their insufficient

review and misclassification errors of by analyzing the "confirmed" and "unconfirmed"

data separately. These practices contributed to delay in recognizing that the devices had a

significant design deficiency that required prompt action.[34]

87.     St. Jude Medical, Inc. ignored the fact that the battery for its products was

not preventing lithium clusters from forming. St. Jude Medical, Inc. failed to recognize

---

[32] Enclosed Response to Form FDA 483 submitted with Letter from Abbott to Commander Steven Porter, District Director for the U.S. Food and Drug Administration, Los Angeles District (March 13, 2017) [hereinafter "Abbott's Response to FDA Form 483"].

[33] Form FDA 483, Inspectional Observations, St. Jude Medical Inc., PEI Number 2017865 (Feb. 17, 2017) (hereinafter "St. Jude Form FDA 483"); FDA Warning Letter to Abbott.

[34] Abbott's Response to FDA Form 483.

this product issue and failed to timely trigger proper corrective and preventive action ("CAPA") procedures.[35]

88.    By August 27, 2014, St. Jude Medical, Inc. had information that premature battery failure with one of its devices even led to a death. St. Jude Medical, Inc. investigated the reported death. During its investigation, St. Jude Medical, Inc. completed an analysis of the returned device. In its analysis, St. Jude Medical, Inc. concluded the cause of premature battery depletion "could not be determined," despite possessing evidence of lithium cluster bridges, which was provided by its supplier.

89.    St. Jude Medical, Inc. did not tell its own management review and medical advisory boards about the full scope of the Battery Depletion Defect. On November 11 and November 12, 2014, representatives of St. Jude Medical, Inc. made two separate presentations for management review concerning premature battery depletions. In these presentations, St. Jude Medical, Inc. only included rates of occurrence of premature battery depletions caused by "confirmed" lithium cluster formations. Neither presentation included information on the potential for "unconfirmed" cases to have been caused by premature battery depletions, despite the fact that St. Jude Medical, Inc. possessed evidence provided by its supplier that the premature battery depletion was caused by lithium cluster bridges. As a result, the presentation significantly underestimated of the probability of occurrence of the battery depletion hazard.[36]

---

[35] *Id.*

[36] St. Jude Form FDA 483; FDA Warning Letter to Abbott.

90.     Additionally, at both presentations, St. Jude Medical, Inc. falsely represented that there was no serious injury or death directly related to lithium cluster formations in the Recalled Devices, failing to disclose that there was a related death to the premature battery depletion issue (MDR#2938836-2014-13599).[37]

91.     St. Jude Medical, Inc. based its risk evaluation of the battery defect on "confirmed" cases, but failed to consider the potential for "unconfirmed" cases. In doing so, it underestimated the occurrence of the hazardous situation posed by the battery defect in the Recalled Devices.[38]

92.     Sometime in 2014, St. Jude Medical, Inc. made a request to Greatbatch to implement a design improvement to the Greatbatch Battery to address the lithium cluster bridging defect. Despite the fact that this design change was made to correct a device defect that posed a serious risk to health, St. Jude Medical, Inc. failed to properly inform the FDA.

## H.     Abbott's Merger Talks with St. Jude Medical, Inc. & St. Jude Medical, Inc.'s New Battery Failure Investigation

93.     In late 2015, representatives of St. Jude Medical, Inc. and Abbott met and commenced discussions of a potential business combination between Abbott and St. Jude Medical, Inc.

94.     Negotiations of a potential merger between Abbott and St. Jude Medical, Inc. continued in early 2016.

---

[37] St. Jude Form FDA 483; FDA Warning Letter to Abbott.

[38] St. Jude Form FDA 483; FDA Warning Letter to Abbott.

95.     On March 16, 2016, Abbott commended an in-depth due diligence review of St. Jude Medical, Inc. Upon information and belief, Abbott's in depth due diligence review continued through April 27, 2016, during which Abbott and St. Jude Medical, Inc. continued to negotiate the terms of the merger agreement.

96.     On March 27, 2016, Abbott and St. Jude Medical, Inc. executed the Merger Agreement.

97.     Following Abbott's due diligence review of St. Jude Medical, Inc. at the end of April 2016, St. Jude Medical, Inc. opened new investigations into the premature battery depletion issue in May of 2016 to "better understand the nature of the failure."[39] Upon information and belief, this additional investigation was implemented as a result of Abbott's due diligence review of St. Jude Medical, Inc.

98.     During the new 2016 investigations, St. Jude Medical, Inc. dramatically and unexplainably changed course from earlier investigations. While St. Jude Medical, Inc. had been categorizing premature battery depletion devices as "unconfirmed" since at least 2011, during this new investigation it designated lithium clusters to be the assignable root cause for the failures, and assigned that cause to a majority of battery depletion returns.[40]

99.     During the new 2016 investigations, St. Jude Medical, Inc. examined for the first time whether the safety alert feature was functioning properly in the premature battery depletion devices. From these investigations, it was concluded that, due to rapid

---

[39] Abbott's Response to FDA Form 483.

[40] *Id.*

battery depletion, the patient notifier for the devices were not consistently lasting the expected three (3) month time frame that was supposed to transpire between the onset of the battery alert to the end of the battery life.[41] Some devices were found to have depleted in less than a day from the onset of the alert. Additionally, some of the devices did not trigger the alert at all due to rapid battery depletion. Had St. Jude Medical, Inc. properly assessed this safety risk years earlier, they would likely have recognized the serious risk the battery failure posed and taken a field action earlier.

100.    During this new investigation, St. Jude Medical, Inc. noted that the rate of occurrence of battery depletion continued to rise.

101.    Based upon this 2016 investigation and the documented findings from the investigation, St. Jude Medical, Inc. made a decision in August 2016 to commence a field action to recall the defective devices.

102.    Throughout the 2016 period of investigation into the battery defect, the field action, and eventual communications and recall with the FDA, Abbott and St. Jude Medical, Inc. were under a merger agreement. Upon information and belief, Abbott was informed of and involved in the decision to issue the recall for devices with the Battery Depletion Defect.

---

[41] *Id.*

**I.**     **Recall Notice**

103.     On October 10, 2016, the FDA issued a Class I Recall (the "Recall") of the

following 251,346 devices sold in the United States that St. Jude Medical, Inc.

manufactured on or before May 2015:

- Fortify VR: Model No(s). CD1231-40, CD1231-40Q;

- Fortify ST VR: Model No(s). CD1241-40, CD1241-40Q;

- Fortify Assura VR: Model No(s). CD1257-40, CD1257-40Q, CD1357-40C, CD1357-40Q;

- Fortify Assura ST VR: Model No(s). CD1263-40, CD1263-40Q, CD1363-40C, CD1363-40Q;

- Fortify DR: Model No(s). CD2231-40, CD2231-40Q;

- Fortify ST DR: Model No(s). CD2241-40, CD-2241-40Q, CD2263-40, CD2263-40Q;

- Fortify Assura DR: Model No(s). CD2257-40, CD2257-40Q, CD2357-40C, CD2357-40Q;

- Fortify Assura ST DR: Model No(s). CD2363-40C, CD2363-40Q;

- Unify: Model No(s). CD3231-40, CD3231-40Q;

- Unify Quadra: Model No(s). CD3249-40, CD3249-40Q;

- Unify Assura: Model No(s). CD3257-40, CD3257-40Q, CD3357-40C, CD3357-40Q;

- Quadra Assura: Model No(s). CD3265-40, CD3265-40Q, CD3365-40C, CD3365-40Q; and

- Quadra Assura MP: Model No(s). CD3269-40, CD3269-40Q, CD3369-40C.

104.     21 C.F.R. § 7.3(g) states: "Recall means a firm's removal or correction of a

marketed product that the Food and Drug Administration considers to be in violation of

the laws it administers and against which the agency would initiate legal action, e.g.

seizure." Recalls are classified by the FDA into one of three categories. The designation

or category "assigned by the Food and Drug Administration to a particular product

recall . . . indicate[s] the relative degree of health hazard presented by the product being

recalled." 21 C.F.R. § 7.3(m).

105.    The FDA categorized the Recall as a "Class I" recall. A Class I recall "is a

situation in which there is a reasonable probability that the use of, or exposure to, a

violative product will cause serious adverse health consequences or death." 21 C.F.R §

7.3(m).

106.    By definition, classifying the Recall as a "Class I" recall confirms that the

devices in question were in violation of federal law and that initiation of legal action or

seizure would be indicated for these devices.

107.    Had St. Jude Medical, Inc. not omitted or failed to disclose the Battery

Depletion Defect or failed to report adverse events information involving the Battery

Depletion Defect, information regarding the defect would likely have appeared in

MAUDE, and would have been publicly accessible to prescribing physicians and the

general public.

108.    Had St. Jude Medical, Inc. not omitted or failed to disclose the Battery

Depletion Defect, physicians would not have implanted the Recalled Devices in

Plaintiff's and the other Nationwide and Alaska Class members' plan participants, and

Plaintiff and the other Class members would not have incurred the medical costs related

30

to the device explant and replacement surgeries, and any medical care necessary to evaluate the function of the Recalled Device.

109.    On October 10, 2016, St. Jude Medical, Inc., *for the first time*, sent a notice to patients, caregivers, and physicians of the premature battery depletion issue, despite knowing of this problem as far back as 2011.

110.    Upon information and belief, Abbott participated in the decision to issue the October 10, 2016 Recall, as Abbott has publicly claimed responsibility for the Recall in subsequent communications issued regarding the Recalled Devices.[42]

111.    On October 11, 2016, the FDA sent out a Safety Communication concerning the premature battery depletion of the Recalled Devices to caregivers of patents with a Recalled Device, and physicians treating patients with heart failure or heart rhythm problems.

112.    The FDA's Safety Communication gave further notice of the battery defect and warned that some batteries could run out within *24 hours* of the low battery alert. In the Safety Communication, the FDA warned healthcare providers not to implant any unused affected devices.

113.    For patients affected by the Recall, Defendants have offered to cover the costs of unreimbursed medical expenses incurred by patients in the U.S. (out-of-pocket expenses) related to the device removal and replacement procedure. Defendants have also

---

[42] Abbott, *A Patient's Guide to the Abbott Battery Performance Alert Update*, SJM-CRM-0817-0091; *News Release*, Abbott (Aug. 29, 2016), http://www.abbott.com/corpnewsroom/product-and-innovation/updates-for-icds.html.

offered to provide payments to U.S. patients for one-time office visits needed to address concerns related to the Battery Depletion Defect and the Recall, covering only unreimbursed medical expenses incurred by the patient (out of pocket expenses, co-pays). These offers of financial support do not cover the medical expenses that the Plaintiff and the other Nationwide and Alaska Class members were or will be required to cover.

114.    Upon information and belief, Abbott knew about the defect and was involved in making the decision to recall the devices and the decision to only reimburse out of pocket costs incurred by patients affected by the defective devices.

115.    An August 29, 2017 Reuters article titled *Abbott Releases New Round of Cyber Updates for St. Jude Pacemakers*, quotes Abbott spokesperson Candace Steele Flippin as saying "Abbott is resolving all old St. Jude Medical issues."[43] Upon information and belief, Abbott, not St. Jude Medical, Inc., is making the decisions about how to mitigate the problems with the Recalled Devices. This control extends to whether to reimburse Plaintiff's or the putative Class members' costs related to those Recalled Devices.

116.    In August 2017, Abbott announced—on Abbott letterhead—that it was releasing the Abbott Battery Performance Alert Update.[44] The Abbott Battery Performance Alert Update, which, upon information and belief was developed and released by Abbott, was designed to mitigate the safety risks with the Recalled Devices.

---

[43] Michael Erman, *Abbott Releases New Round of Cyber Updates for St. Jude Pacemakers*, Reuters (Aug. 29, 2017), *available at* https://finance.yahoo.com/news/abbott-releases-round-cyber-updates-st-jude-pacemakers-162734328--finance.html.

[44] Abbott, *A Patient's Guide to the Abbott Battery Performance Alert Update*, SJM-CRM-0817-0091.

This "Update" evidences Abbott's continuing involvement with and assumption of responsibility for the Recalled Devices. As Abbott states, the Abbott Battery Performance Alert Update "is intended to be used as a tool to provide physicians with earlier warning of premature battery depletion from short circuits due to lithium clusters in devices subject to the October 11, 2016 Medical Device Advisory for premature battery depletion."[45]

117.    In the Patient's Guide to the Abbott Battery Performance Alert Update, Abbott takes responsibility for issuing the Recall and informing patients and physicians of the Battery Depletion Defect: "In October 2016, Abbott notified physicians and patients that a subset of ICDs and cardiac resynchronization therapy defibrillator (CRT-D) devices manufactured between January 2010 and May 2015 could potentially experience premature battery depletion."[46] This Patient's Guide directs those with further questions about the Battery Performance Alert to "please contact our dedicated hotline . . . or visit our website at sjm.com/batteryupdate."[47] This same information was provided in an Abbott news release on August 29, 2017.[48]

## J.    FDA Conducts Inspection of Abbott for the Battery Depletion Defect and Cites Abbott for Violating Federal Requirements

118.    From February 7-17, 2017, FDA investigators inspected Abbott's facility in Sylmar, California to investigate the handling of the Battery Depletion Defect.

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *News Release*, Abbott (Aug. 29, 2016), http://www.abbott.com/corpnewsroom/product-and-innovation/updates-for-icds.html.

119.    The Sylmar, California facility formerly belonged to St. Jude Medical, Cardiac Rhythm Management Division ("CRMD"). It continues to be listed in the name of St. Jude Medical, CRMD. However, in a March 13, 2017 letter Abbott sent to the FDA, Abbott represented that it acquired the St. Jude Medical, CRMD Sylmar facility on January 4, 2016, and states that this facility is now the Abbott Cardiovascular and Neuromodulation Division's Sylmar facility, despite continuing to be listed in the St. Jude name.[49]

120.    The FDA's inspections into the Recalled Devices at Abbott's facility revealed that St. Jude Medical, Inc. was deficient in following its CAPA procedures.[50] The inspections also revealed that St. Jude Medical, Inc. had knowledge of the Battery Depletion Defect as far back as 2011, but failed to report health risks posed by the device, failed to follow reporting requirements, and failed to adequately control products that did not conform to specifications. The FDA detailed these deficiencies and violations in two letters: a Form FDA 483 Letter directed to St. Jude Medical, Inc., and a Warning Letter directed to Abbott.

121.    As a result of its investigation, the FDA concluded that St. Jude Medical, Inc. failed to establish and maintain procedures for implementing corrective and preventative actions, as required by 21 C.F.R. § 820.100(a).[51] St. Jude Medical, Inc.'s

---

[49] Letter from Abbott to Commander Steven Porter, District Director for the U.S. Food and Drug Administration, Los Angeles District (March 13, 2017) [hereinafter "Abbott's Response Letter to the FDA"].

[50] FDA Warning Letter to Abbott.

[51] FDA Warning Letter to Abbott.

actions violated federal requirements, including a CAPA requirement that requires the

level of corrective action and preventive action be commensurate with the significance

and risk of the nonconformance, and requirement that the risk evaluation of

nonconformances be based on three factors: severity, probability, and detectability.[52]

122.    As a result of its investigation, the FDA investigators determined that St.

Jude Medical, Inc. violated—and its successor continued to be in violation of—the

required Quality Management Review SOP ("standard operating procedure").[53]

123.    The FDA investigators also discovered that St. Jude Medical, Inc. released

ten recalled ICDs from its distribution centers after the October 2016 recall had been

issued. Between October 14 and October 26, 2016, seven additional recalled ICDs in the

control of St. Jude Medical, Inc.'s U.S. Field Representatives were implanted into

patients.[54]

124.    The FDA investigators also determined St. Jude Medical, Inc. violated 21

C.F.R. § 820.90(a) by "failing to establish and maintain procedures to control product

that does not conform to specified requirements."[55]

125.    As a result of these and other noted deficiencies, the FDA issued a Form

FDA 483 Report to St. Jude Medical, Inc.[56] "An FDA Form 483 is issued to firm

management at the conclusion of an inspection when an investigator(s) has observed any

---

[52] St. Jude Form FDA 483; FDA Warning Letter to Abbott.

[53] St. Jude Form FDA 483; FDA Warning Letter to Abbott.

[54] *Id.*

[55] *Id.*

[56] St. Jude Form FDA 483.

conditions that in their judgement may constitute violations of the Food Drug and

Cosmetic (FD&C) Act and related Acts. FDA investigators are trained to ensure that each

observation noted on the FDA Form 483 is clear, specific and significant. Observations

are made when in the investigator's judgement, conditions or practices observed would

indicate that any food, drug, device or cosmetic has been adulterated or is being prepared,

packed, or held under conditions whereby it may become adulterated or rendered

injurious to health."[57] The observations listed on the Form FDA 483 are not exhaustive,

and there may have also been other objectionable conditions at the time.

126.    Specifically, following the February 2017 inspection, the FDA cited

numerous deficiencies with respect to the Recalled Devices:

      a.  St. Jude Medical, Inc. repeatedly concluded that the cause of premature

          depletion of the Greatbatch QHR2850 battery "could not be determined"

          ***when 42 Product Analysis Reports produced between 2011 and 2014***

          ***provided ample evidence that lithium cluster bridging had prematurely***

          ***drained the battery***;

      b.  St. Jude Medical, Inc.'s investigations into the Battery Depletion Defect

          were not timely;

      c.  St. Jude Medical, Inc. failed to follow CAPA procedures;

      d.  Defendants failed to provide complete and accurate information to

          management review and medical advisory boards regarding the premature

---

[57] *FDA Form 483 Frequently Asked Questions*, FDA, https://www.fda.gov/iceci/inspections/
ucm256377.htm (July 24, 2017).

battery depletion issue, including a failure to disclose accurate rates of

occurrence and failure to note a death caused by the Battery Depletion

Defect; and

    e.   Defendants failed to timely notify the FDA of a serious risk to health posed

        by the Recalled Devices.[58]

127.    As a result of the FDA investigation, the FDA determined the Recalled

Devices were adulterated within the meaning of section 501(h) of the FDCA, 21 U.S.C.

§ 351(h), because the methods used in, or controls used for, their manufacture, packing,

storage, or installation are not in conformity with the CMGP requirements under 21

C.F.R. part 820.[59]

128.    The FDA sent the Form FDA 483 Report to Abbott's Sylmar, California

facility. While the Form FDA 483 was directed to St. Jude Medical, Inc.'s attention, upon

information and belief, Abbott received the Form FDA 483 and assumed responsibility

for this investigation.

129.    In response to the observations listed in the Form FDA 483, Abbott sent the

FDA a response letter on March 13, 2017, on Abbott letterhead, regarding the FDA's

investigations into the Battery Depletion Defect. This letter was signed by Vishnu

Charan, VP of Operations for Abbott, and Nalin Perera, Sr. Director of Operations

---

[58] St. Jude Form FDA 483; FDA Warning Letter to Abbott.
[59] FDA Warning Letter to Abbott.

Quality for Abbott.[60] Mr. Charan and Ms. Perera were formerly executives of St. Jude Medical, Inc., but now work for Abbott holding substantially the same titles.

130.    In Abbott's March 13, 2017, response letter to the FDA, Abbott answered on behalf of "St. Jude Medical," and asserted responses and admissions as to "St. Jude Medical's" responsibility for the Battery Depletion Defect, and its handling, investigation, and decisions regarding the Recalled Devices.[61] Abbott further stated its efforts to continue investigating and correcting the deficiencies cited by the FDA.

131.    On April 12, 2017, the FDA sent a warning letter to Mike Rousseau, President of Abbott's Cardiovascular & Neuromodulation Division, further detailing the violations found during the FDA inspection of the Recalled Devices, as described herein, and requesting remedial action from Abbott regarding the failures at its facility that contributed to or exacerbated the Battery Depletion Defect.[62]

**K.     "St. Jude Medical Is Now Abbott"**

132.    St. Jude Medical, LLC's and Abbott's websites both state that "St. Jude Medical is now Abbott."[63] Since their merger, Abbott has lived out this statement, ignoring the legal separateness of these entities and comingling their identities.

133.    Upon information and belief, Abbott and St. Jude Medical, LLC share substantially identical officers, management, business operations, and facilities.

---

[60] Abbott's Response Letter to the FDA.

[61] *Id.*

[62] FDA Warning Letter to Abbott.

[63] St. Jude Medical (Jan. 9, 2017), https://www.sjm.com/; *St. Jude Medical Is Now Abbott*, Abbott, http://www.abbott.com/abbott-stjudemedical-en.html (last visited Nov. 6, 2017).

134.    Upon information and belief, St. Jude Medical, LLC's income is funneled to Abbott as income from a subsidiary. St. Jude Medical, LLC's earnings are consolidated with Abbott's on financial statements Abbott reported to the SEC, as can be seen from Abbott's most recent quarterly report.

135.    Upon completion of the merger, several of St. Jude Medical's executives became employees and executives of Abbott, including Michael Rousseau. Mr. Rousseau, formerly St. Jude Medical's CEO, became the President of the Cardiovascular & Neuromodulation Division of Abbott upon completion of the Mergers.

136.    Upon information and belief, Abbott and/or Abbott's Cardiovascular & Neuromodulation Division, which operates out of the Sylmar, California facility, exercises control over St. Jude Medical, LLC's operations in all meaningful ways.

137.    Abbott has fostered and advanced the impression and reality that they and St. Jude Medical, LLC are one entity. Abbott acted and continued to act as the sole voice for "St. Jude Medical" with the FDA, and exercised complete dominion and control over St. Jude Medical, LLC in directing its response to FDA investigations into St. Jude Medical, Inc.'s actions with respect to the Recalled Devices. Abbott has also disregarded the legal separateness in publicly assuming control over the Recall.

138.    Upon information and belief, in its actions with respect to the FDA and in involving itself intricately in the Recall, Abbott has comingled its corporate identity with that of St. Jude Medical, LLC and St. Jude Medical, Inc.

**L.     Conduct in Violation of the FDCA**

139.   St. Jude Medical, Inc. violated these FDCA statutes and accompanying

regulations by:

   a.   falsely and misleadingly promoting its ICD and CRT-D devices;

   b.   failing to report to the FDA adverse events;

   c.   failing to timely conduct failure investigations and analysis;

   d.   failing to timely report any and all information concerning product

        failures and corrections;

   e.   failing to timely and fully inform the FDA of unanticipated adverse

        effects, increases in the incidence of adverse effects, and device

        failures necessitating a labeling, manufacturing or device

        modification;

   f.   failing to follow CAPA procedures;

   g.   failing to follow CGMPs; and

   h.   selling and distributing a misbranded and adulterated product through

        interstate commerce.

140.   St. Jude Medical, Inc.'s violation of these FDCA statutes and accompanying

regulations, as discussed above, constitutes a parallel violation of the causes of action

alleged in this Complaint, as set forth herein.

141.   St. Jude Medical, Inc.'s violation of the FDCA statutes and accompany

regulations, as discussed above, directly caused or significantly contributed to the use of

the Recalled Devices; and St. Jude Medical, Inc.'s misconduct in this regard thus caused or

contributed to Plaintiff's and the other Nationwide and Alaska Class members' injuries and damages.

**M.     The Effect of St. Jude Medical, Inc.'s Wrongful Conduct**

142.    Because of St. Jude Medical, Inc.'s failure to properly investigate and report the Battery Depletion Defect, St. Jude Medical, Inc. failed to promptly take action to remedy the defect and notify the FDA and others of the defect. As a direct result of these failures, St. Jude Medical, Inc. continued to distribute devices containing this battery until October 2016, allowing for the additional implantation of knowingly defective devices at Plaintiff's and the other Nationwide and Alaska Class members' expense.

143.    As a direct and proximate cause of St. Jude Medical, Inc.'s conduct and the defective St. Jude Medical, Inc. ICD and CRT-Ds:

> a.    Plaintiff and the other Nationwide and Alaska Class members paid for defective devices.
>
> b.    Plaintiff's and the other Nationwide and Alaska Class members' plan participants have suffered injuries and/or received related medical treatment and care. Accordingly, Plaintiff and the other Nationwide and Alaska Class members have paid medical costs for the Recalled Devices including, but not limited to, the original defective device, implantation surgery, explant and replacement surgery, and medical monitoring and/or other related healthcare costs.

144.    Plaintiff's action benefits the public by, among other things, addressing the prevention or curtailment of false and misleading marketing and sales of life-threatening and otherwise defective products, and seeking reimbursement of damages caused by prevalent deceptive marketing, distribution, and sale of those products.

## V.    CLASS ACTION ALLEGATIONS

145.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

146.    Plaintiff seeks to represent a class (the "Nationwide Class"), defined as:

> All third party health benefits payors in the United States (including its Territories and the District of Columbia) who (i) have been a party to a contract, issuer of a policy or sponsor of a plan which contract, policy or plan provides medical coverage to natural persons, and (ii) have incurred, pursuant to such contract, policy or plan, full or partial costs for insureds who have had implanted an ICD or CRT-D device manufactured by St. Jude Medical, Inc. subject to the FDA's October 2016 Premature Battery Depletion Recall.

147.    Plaintiff also seeks to represent an Alaska statewide class (the "Alaska Class"), defined as:

> All third party health benefits payors in Alaska who (i) have been a party to a contract, issuer of a policy or sponsor of a plan which contract, policy or plan provides medical coverage to natural persons, and (ii) have incurred, pursuant to such contract, policy or plan, full or partial costs for insureds who have had implanted have had implanted an ICD or CRT-D device manufactured by St. Jude Medical, Inc. subject to the FDA's October 2016 Premature Battery Depletion Recall.

148.    Excluded from the Nationwide Class and the Alaska Class are Defendants and their subsidiaries, franchises, and affiliates; all employees of Defendants; all persons

who make a timely election to be excluded from either Class; government entities;

Plaintiff's counsel, and the judge to whom this case is assigned, including his/her

immediate family and court staff. Plaintiff reserves the right to modify or amend these

Nationwide and Alaska Class definitions, as appropriate, during the course of this

litigation.

149.    This action has been brought and may properly be maintained on behalf of

the Nationwide and Alaska Classes proposed herein under the criteria of Rule 23 of the

Federal Rules of Civil Procedure.

150.    Plaintiff is a member of the Nationwide and Alaska Classes it seeks to

represent.

151.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of

the Nationwide and Alaska Classes are so numerous and geographically dispersed that

individual joinder of all class members is impracticable. While Plaintiff is informed and

believes that there are not less than thousands of Nationwide and Alaska Class members,

the precise number of Class members presently unknown to Plaintiff, but may be

ascertained from information contained in a device registry and other records maintained

by Defendants and certain third parties, including hospitals. Nationwide and Alaska Class

Members may be notified of the pendency of this action by recognized, Court-approved

notice dissemination methods, which may include U.S. Mail, electronic mail, Internet

postings, and/or published notice.

152.    **Commonality and Predominance – Federal Rule of Civil Procedure**

**23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which

predominate over any questions affecting individual Nationwide and/or Alaska Class members, including, without limitation:

(a)     Whether Defendants engaged in the conduct alleged herein;

(b)     Whether Defendants' alleged conduct violates applicable law;

(c)     Whether Defendant Abbott is the alter ego of St. Jude Medical, LLC;

(d)     Whether Defendant Abbott is the alter ego of St. Jude Medical, Inc.;

(e)     Whether Defendants are liable as the de facto or de jure successors in interest to St. Jude Medical, Inc.;

(f)     Whether St. Jude Medical, Inc. failed to comply with FDCA and FDA standards and requirements in the design, manufacture, approval, reporting, and correcting of the Recalled Devices;

(g)     Whether there are manufacturing defects in violation of FDA standards and requirements in the Recalled Devices that cause an increased risk of failure;

(h)     Whether St. Jude Medical, Inc. violated FDCA and FDA standards and requirements by knowingly using a defective battery in the Recalled Devices;

(i)     Whether St. Jude Medical, Inc. violated FDCA and FDA standards and requirements by failing to properly investigate, and report evidence of premature battery failure and battery defects to the FDA;

(j)     Whether St. Jude Medical, Inc. omitted material facts or made false or misleading claims about the safety, quality, longevity, and usefulness of the

Recalled Devices in its advertisements, promotional materials, warranties, and other materials;

(k)     Whether Plaintiff and the other members of the Nationwide and Alaska Classes have been injured by virtue of St. Jude Medical, Inc.'s business practices and conduct;

(l)     Whether St. Jude Medical, Inc. negligently and/or fraudulently tested, assembled, marketed, supplied, distributed, and/or sold the Recalled Devices in violation of federal requirements;

(m)     Whether St. Jude Medical, Inc.'s conduct in manufacturing, marketing, and monitoring the Recalled Devices in violation of federal requirements fell below the duty of care owed to Plaintiff and the other members of the Nationwide and Alaska Classes;

(n)     Whether St. Jude Medical, Inc. engaged in unfair or deceptive acts or practices when they concealed the inherent defective conditions and dangers of the Recalled Devices and when they failed to warn the FDA of same in violation of the Alaska Consumer Protection Act, Alaska Stat. §§ 45.50.471, *et seq.* or the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §§ 325F.69, *et seq.*;

(o)     Whether Defendants were unjustly enriched by the sale of the Recalled Devices at the expense of Plaintiff and the other members of the Nationwide and Alaska Classes;

(p)     Whether St. Jude Medical, Inc. breached express and implied warranties;

(q)     Whether Plaintiff and the other members of the Nationwide and

Alaska Classes are entitled to damages, restitution, restitutionary disgorgement,

equitable relief, statutory damages, exemplary damages, and/or other relief; and

(r)     The amount and nature of relief to be awarded to Plaintiff and the

other members of the Nationwide and Alaska Classes.

153.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims

are typical of the other Nationwide and Alaska Class members' claims because Plaintiff's

claims arise from the same practices and course of conduct that give rise to the claims of

the other Nationwide and Alaska Class members, namely Defendants' failure to properly

investigate the Battery Depletion Defect, and their subsequent failure to take action

concerning the Recalled Devices.

154.    **Adequacy of Representation – Federal Rule of Civil Procedure**

**23(a)(4).** Plaintiff is an adequate Class representative because its interests does not

conflict with the interests of the other Nationwide and Alaska Class members it seeks to

represent. Plaintiff has retained counsel competent and experienced in complex class

action litigation, and Plaintiff intends to vigorously prosecute this action. The Nationwide

and Alaska Classes' interests will be fairly and adequately protected by Plaintiff and its

counsel.

155.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure**

**23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to

Plaintiff and the other Nationwide and Alaska Class members, thereby making

appropriate final injunctive relief and declaratory relief, as described below, with respect to the other Nationwide and Alaska Class members as a whole.

156.   **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Nationwide and Alaska Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the Nationwide and Alaska Class members to individually seek redress for Defendants' wrongful conduct. Even if the Nationwide and Alaska Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Breach of Express Warranty
### (On behalf of Plaintiff, the Nationwide Class, and the Alaska Class)

157.   Plaintiff hereby incorporates by reference Paragraphs 1-156, as if fully set forth herein.

158.    The FDA's Center for Devices and Radiological Health, which reviews PMA submissions for ICD and CRT-D devices does not evaluate information related to contract liability warranties in the PMA review and approval process. Thus, the contractual warranties fall outside the scope of PMA review and approval. The FDA requires that any such warranty statements be truthful, accurate, and not misleading, and consistent with applicable federal and state laws.

159.    Upon information and belief, through their public statements and descriptions of Recalled Devices, St. Jude Medical, Inc. expressly warranted among other things, that the Recalled Devices were effective and safe for their intended use, and made claims regarding the devices' longevity, such as that the "battery is specially designed to power [the] device for a long time."

160.    For example, St. Jude Medical, Inc.'s website maintained that the company had a "commitment to safe, reliable and effective" ICDs and CRT-Ds.  Further, St. Jude's website stated that "whether you can feel [them] or not," the ICDs and CRT-Ds were "doing [their] work."

161.    When St. Jude Medical, Inc. made these express warranties, they knew the purpose for which the Recalled Devices were to be used, and warranted that these devices were in all respects safe and proper for that purpose.

162.    St. Jude Medical, Inc. drafted the documents and/or made statements upon which these warranty claims are based and, in doing so, defined the terms of those warranties.

163.   By virtue of the fact that St. Jude Medical, Inc. obtained PMA approval to sell the Recalled Devices as Class III devices, St. Jude Medical, Inc. expressly warranted with "reasonable assurance" that the devices were safe and effective for use.

164.   Plaintiff and the other Nationwide and Alaska Class members purchased the devices on behalf of their plan participants relying on these express representations and warranties.

165.   The Recalled Devices do not conform to St. Jude Medical, Inc.'s representations in that these devices contained a defective battery.

166.   As such, the Recalled Devices did not conform to St. Jude Medical, Inc.'s promises, descriptions, or affirmations of fact, and was not adequately packaged, labeled, promoted, or fit for the ordinary purposes for which such devices are used.

167.   As a direct and proximate result of the breach of St. Jude Medical, Inc.'s warranties, Plaintiff and the other Nationwide and Alaska Class members have paid for health care costs related to the Recalled Devices which they have paid and are expected to pay, and for which Defendants are liable, in an amount to be proven at trial.

168.   Plaintiff and the other Nationwide and Alaska Class members incurred additional expenses because it paid for the original installations of its plan participants' medically-required ICDs and CRT-Ds based upon a health payment plan. When Plaintiff paid these costs, it did so for properly-functioning ICDs and CRT-Ds, with an expected life cycle. Instead, Plaintiff paid for ICDs and CRT-Ds with potentially early-discharging batteries, which might subject its plan participants to catastrophic risk.

169.   St. Jude Medical, Inc.'s successors in interest, however, refuse to pay these amounts. This is despite that in the Patient's Guide to the Abbott Battery Performance Alert Update, Abbott takes responsibility for issuing the Recall and informing patients and physicians of the Battery Depletion Defect.

170.   Additionally, St. Jude Medical, LLC's website provides that it will reimburse patients up to a certain amount for replacement devices and one-time office visit; however, these amounts are not enough to fully compensate Plaintiff's and the other Class members' claims.

171.   As Defendants have issued a recall, as well as a reimbursement program, and are able to pinpoint whether a particular device is subject to the global medical advisory,[64] they are keenly aware of the trouble with the particular pacemakers referenced in this lawsuit.

172.   Plaintiff's and the other Nationwide and Alaska Class members' claims are limited to damages incurred in association with the reimbursement of medical expenses to those plan participants who have not settled personal injury claims with Defendants.

**SECOND CLAIM FOR RELIEF**
**Breach of Implied Warranty of Merchantability**
**(On behalf of Plaintiff, the Nationwide Class, and the Alaska Class)**

173.   Plaintiff hereby incorporates by reference Paragraphs 1-156, as if fully set forth herein.

---

[64] *Is your device subject to this advisory?*, St. Jude Medical, https://www.sjm.com/en/patients/ arrhythmias/resources-support/battery-advisory (last accessed Nov. 3, 2017).

174.    At the time St. Jude Medical, Inc. marketed, sold, and distributed the Recalled Devices, it knew of the use for which the product was intended and impliedly warranted the product to be of merchantable quality, safe, fit, and effective for such use.

175.    Despite these representations, St. Jude Medical, Inc.'s successors in interest refuse to pay for damages.

176.    St. Jude Medical, Inc. knew, or had reason to know, that Plaintiff and the other Nationwide and Alaska Class members would rely on St. Jude Medical, Inc.'s judgment and skill in providing that the Recalled Devices were safe and fit for their intended use.

177.    Plaintiff and the other Nationwide and Alaska Class members reasonably relied upon St. Jude Medical, Inc.'s skill and judgment as to whether the Recalled Devices were of merchantable quality, safe, fit, and effective for its intended use when Plaintiff and the other Nationwide and Alaska Class members allowed and paid for the implantation of the Recalled Devices into their plan participants.

178.    Contrary to such implied warranty, the Recalled Devices, were not of merchantable quality or safe, fit and effective for its intended use, because the product was adulterated and manufactured in violation of federal law and regulations.

179.    As Defendants have issued a recall, as well as a reimbursement program, and are able to pinpoint whether a particular device is subject to the global medical

advisory,[65] they are keenly aware of the trouble with the particular pacemakers referenced in this lawsuit.

180.    As a direct and proximate result of the breach of implied warranty, Plaintiff and the other Nationwide and Alaska Class members have incurred health care costs related to the Recalled Devices, which they have paid, and for which Defendants are liable, in an amount to be proven at trial. Plaintiff's and the other Nationwide and Alaska Class members' claims are limited to damages incurred in association with the reimbursement of medical expenses to those plan participants who have not settled personal injury claims with Defendants.

### THIRD CLAIM FOR RELIEF
### Negligence
### (On behalf of Plaintiff, the Nationwide Class, and the Alaska Class)

181.    Plaintiff hereby incorporates by reference Paragraphs 1-156, as if fully set forth herein.

182.    St. Jude Medical, Inc. designed, manufactured, marketed, detailed, and advertised the Recalled Devices to Plaintiff and the other Nationwide and Alaska Class members, their plan participants, and their physicians.

183.    St. Jude Medical, Inc. thus had a duty to perform each of these functions reasonably and with reasonable and due care for the safety and well-being of patients in whom the devices would be implanted and for the entities that would pay for them,

---

[65] *Is your device subject to this advisory?*, St. Jude Medical, https://www.sjm.com/en/patients/ arrhythmias/resources-support/battery-advisory (last accessed Nov. 3, 2017).

including Plaintiff and the other Nationwide and Alaska Class members. St. Jude Medical, Inc. failed to reasonably execute those duties.

184.    St. Jude Medical, Inc. failed to use reasonable and due care for the safety and well-being of those in whom the Recalled Devices would be implanted for the entities that would pay for them, including Plaintiff and the other Nationwide and Alaska Class members, and Defendants are liable to this negligence in the following respects:

    a.    Failure to manufacture the Recalled Devices to conform with federal laws, regulations, and requirements;

    b.    Failure to comply with CGMPs;

    c.    Upon information and belief, failure to manufacture the Recalled Devices to conform to the requirements in its PMA;

    d.    Failure to adequately investigate, assess, and report the premature battery failure risks with the Greatbatch Battery, in violation of federal regulations and requirements;

    e.    Failure to promptly act upon reports of early failure in violation of federal regulations and requirements, such that the Recalled Devices continued to be implanted in unknowing patients by physicians well after physicians should have been notified of the defect, and/or the devices should have been recalled or sales suspended.

185.    The above conduct illustrates St. Jude Medical, Inc.'s failure to exercise reasonable and appropriate care. It was foreseeable that such negligence would causing damage to Plaintiff and the other Nationwide and Alaska Class members, which had or

will have to pay costs associated with assessing, monitoring, and replacing the defective devices.

186.    Intervening causes—such as patient preference, physician judgment, or patient reimbursement decision—would not have impacted Plaintiff's negligence claim, because Plaintiff would not have a negligence claim if the Recalled Devices were not inherently defective.

187.    As a direct and proximate result of St. Jude Medical, Inc.'s negligence, for which Defendants are liable, Plaintiff and the other Nationwide and Alaska Class members have paid for or will pay for health care costs related to the Recalled Devices, which they have paid or are expected to pay in an amount to be proven at trial. Plaintiff's and the other Nationwide and Alaska Class members' claims are limited to damages incurred in association with the reimbursement of medical expenses to those plan participants who have not settled personal injury claims with Defendants.

**FOURTH CLAIM FOR RELIEF**
**Failure to Warn**
**(On behalf of Plaintiff, the Nationwide Class, and the Alaska Class)**

188.    Plaintiff hereby incorporates by reference Paragraphs 1-156, as if fully set forth herein.

189.    St. Jude Medical, Inc. had a continuing duty to monitor its ICDs and CRT-Ds after premarket approval and to discover and report to the FDA any complaints about the device's performance and any adverse health consequences which it became aware of and that are or may be attributable to its devices.

190. St. Jude Medical, Inc. had a continuing duty to provide ongoing warnings and instructions regarding safety hazards associated with its ICDs and CRT-Ds, which included obligations under the FCTA and FDA regulations, to investigate and report adverse events and potential device risks to the FDA.

191. St. Jude Medical, Inc. had a continuing duty under federal law and regulations to warn the FDA of new scientific studies concerning the safety of its PMA approved devices, which it reasonably knew or should have known existed.

192. Additionally, St. Jude Medical, Inc. had a duty to warn physicians and their patients of safety hazards associated with its ICDs and CRT-Ds, such as any depletion of the Recalled Devices' battery lives, which may put patients at severe risk. Such a duty runs parallel to, and is not in addition to, its duties to report adverse events and potential device risks to the FDA.

193. St. Jude Medical, Inc. breached its duty by failing to timely and adequately report potential defective battery issues associated with the Recalled Devices to the FDA in violation of federal law.

194. St. Jude Medical, Inc. also breached this duty by failing to conduct adequate risk analyses and investigations required by federal law and regulations regarding any potential safety defects associated with the Recalled Devices.

195. As a result of St. Jude Medical, Inc. breaches of their duty under federal law, St. Jude Medical, Inc. breached its duty to use reasonable care under state negligence law.

196.    Had St. Jude Medical, Inc. timely and properly investigated or analyzed the potential battery defects in its devices and/or had St. Jude Medical, Inc. timely reported adverse events and potential risks associated with a defective battery to the FDA, they would have appeared on the FDA's MAUDE internet database and in medical journals, and the FDA would have investigated the reports and issued Safety Communications and a Class I recall prior to October 10, 2016. As a result, physicians would not have recommended the specific device be implanted in Plaintiff's and the other Nationwide and Alaska Class members' plan participants before October 10, 2016.

197.    As a direct and proximate result of St. Jude Medical, Inc.'s failure to warn, its defective devices continued to be sold and implanted in Plaintiff's and the other Nationwide and Alaska Class members' plan participants after St. Jude Medical, Inc. knew or should have known that these devices were associated with a serious undisclosed risk and were unsafe for their intended use. As these devices continued unabated, and additional defective devices were implanted in Plaintiff's and the other Nationwide and Alaska Class members' plan participants. Accordingly, those plan participants are at risk for immediate bodily harm, which would require immediate and necessary medical costs that would not be covered by Defendants.

198.    As a direct and proximate result of St. Jude Medical, Inc.'s failure to warn, Plaintiff's and the other Nationwide and Alaska Class members' plan participants have received related medical treatment and care and costs associated with assessment of the devices, and replacement and implantation of a new ICD or CRT-D device, which could have been avoided had the risk been disclosed earlier. The costs of this additional

medical treatment fell primarily on Plaintiff and the other Nationwide and Alaska Class members, who were required to cover their plan participants' treatment costs and device replacement.

199.    As a direct and proximate result of St. Jude Medical, Inc.'s wrongful conduct, for which Defendants are liable, Plaintiff and the other Nationwide and Alaska Class members have been damaged in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF
### Product Liability – Manufacturing Defect
### (On behalf of Plaintiff, the Nationwide Class, and the Alaska Class)

200.    Plaintiff hereby incorporates by reference Paragraphs 1-156, as if fully set forth herein.

201.    Upon information and belief, the Recalled Devices contain a manufacturing defect because the actual manufacture of the Recalled Devices differs from the specifications and requirements set forth in the PMA and/or the FDA's conditions for approval.

202.    Upon information and belief, the Recalled Devices contain a manufacturing defect because the actual manufacture of the Recalled Devices differs from the requirements under the CGMPs, 21 C.F.R. Part 820.

203.    This manufacturing defect was present in the Recalled Devices when they left St. Jude Medical, Inc.'s control.

204.    The Recalled Devices were expected to and did reach Plaintiff's and other Nationwide and Alaska Class members' plan participants without substantial change or adjustment to their mechanical function upon implanting the devices.

205.    Accordingly, plan participants are at risk for immediate bodily harm, which would require immediate and necessary medical costs that would not be covered by Defendants.

206.    As a direct and proximate result of this product defect, Plaintiff's and the other Nationwide and Alaska Class members' plan participants have received or will receive related medical treatment and care and costs associated with assessment of the devices and replacement and installation of a new ICD or CRT-D device. The costs of this additional medical treatment fell primarily on Plaintiff and the other Nationwide and Alaska Class members, who were and will be required to cover the costs of the treatment and device replacement.

207.    As a direct and proximate result of St. Jude Medical, Inc.'s wrongful conduct, for which Defendants are liable, Plaintiff and the other Nationwide and Alaska Class members have been damaged in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
**Violation of Minnesota Prevention of Consumer Fraud Act - Minn. Stat. §§ 325F.69**
**& 325F.67 (On behalf of Plaintiff and the Nationwide Class)**

208.    Plaintiff hereby incorporates by reference Paragraphs 1-156, as if fully set forth herein.

209.    Minnesota has significant contacts with each class member by virtue of St. Jude Medical, Inc.'s prior domicile and its activities related to the claims alleged herein. St. Jude Medical, Inc. was incorporated, headquartered, and has its principal place of business in Minnesota, where the corporation oversaw and controlled the sale of its products and related FDA and regulatory affairs, prior to the merger.

210.     St. Jude Medical, Inc. deceptively omitted or misrepresented material information regarding the Battery Depletion Defect and the safety of the Recalled Devices, violating their duty to disclose under federal requirements.

211.     Specifically, as alleged herein, St. Jude Medical, Inc. knew of the Battery Depletion Defect as early as 2011, but failed to take action to investigate and report this known risk, *instead waiting nearly five years before issuing a recall of the defective devices*.

212.     Despite the extensive evidence, and its clear knowledge of the premature battery depletion problem in its devices, St. Jude Medical, Inc. failed to take prompt action, and knowingly ignored or concealed this evidence from its management boards, from the FDA, and from the public, including Plaintiff and the other Nationwide and Alaska Class members.

213.     In 2014, St. Jude Medical, Inc.'s management review and medical advisory boards were given two separate presentations on premature battery depletion. During these meetings, St. Jude Medical, Inc. failed to tell fully disclose the full scope of the battery issue, presented false or incomplete evidence of the defect, and concealed evidence of a known death related to this battery defect stating instead that there were no serious injuries or deaths directly related to lithium cluster bridging.

214.     St. Jude Medical, Inc. also concealed the Battery Depletion Defect from the FDA, medical providers, TPPs, and patients for years, putting hundreds of thousands of its device users at severe risk. As a result, St. Jude Medical, Inc. allowed thousands more defective devices to be implanted in patients across the United States at the Nationwide

and Alaska Class members' expense. Even today, St. Jude Medical, Inc.'s successors in interest refuse to pay for removal and replacement of the defective devices.

215.    St. Jude Medical, Inc. ignored and concealed the Battery Depletion Defect for five years until, on information and belief, it was compelled to further investigate the issue by Abbott. As a result of the new 2016 investigations, lithium cluster bridging was finally identified as the root cause and a decision was made to recall the affected devices.

216.    As a result of the Battery Depletion Defect, and St. Jude Medical, Inc.'s concealment thereof, Nationwide and Alaska Class members bought defective devices and patients with a Recalled Device have had to undergo the invasive, dangerous, and expensive process of having their defective devices explanted and replacement devices implanted, and medical expenses associated with assessment of the defective device.

217.    If Defendants had not omitted to disclose or misrepresented the defects in the Recalled Devices, physicians would not have used the Recalled Devices and the Recalled devices would not have been implanted in the Plaintiff's and the other Nationwide Class members' plan participants. Accordingly, Plaintiff and the other Nationwide Class members would not have incurred costs for the Recalled Devices and the medical costs of device removal and replacement surgery and other related medical costs.

218.    By reason of the conduct as alleged herein, and by inducing Plaintiff's and the other Nationwide Class members' plan participants, and the plan participants' physicians to use the Recalled Devices, and inducing Plaintiff and the other Nationwide Class members to pay for it, through the use of deception, fraud, false advertising, false

pretenses, misrepresentations, omissions, unfair and/or deceptive practices and the

concealment and suppression of material facts, including but not limited to fraudulent

statements, concealments and misrepresentations identified herein and above in violation

of federal laws and regulations, St. Jude Medical, Inc. engaged in unfair or deceptive acts

and practices in the conduct of trade or commerce in violation of the Minnesota

Prevention of Consumer Fraud Act, Minn. Stat. § 325F.69, and Fraudulent Advertising,

Minn. Stat. § 325F.67.

219.    As a direct and proximate result of St. Jude Medical, Inc.'s unlawful

conduct, for which Defendants are liable, Plaintiff's and the other Nationwide Class

members' plan participants were implanted with a Recalled Device, which would not

have occurred had Defendants not used unfair and/or deceptive practices and not omitted

or concealed its knowledge of the Battery Depletion Defect.

220.    But-for St. Jude Medical, Inc.'s unfair and/or deceptive practices described

above, for which Defendants are liable, physicians would not have prescribed the use of a

Recalled Device in Plaintiff's and the other Nationwide Class members' plan

participants, and Plaintiff and the other Nationwide Class members would not have

purchased the Recalled Devices and would not have incurred medical costs related to

explantation of the Recalled Devices and replacement with a new device or for medical

visits to assess the defective device.

221.    By reason of such violations, and pursuant to the Minnesota Prevention of

Consumer Fraud Act and the Minnesota Private Attorney General Statute, Minn. Stat.

§ 8.31, subd. 3a, Plaintiff, individually and on behalf of the other Nationwide Class

members, is entitled to recover damages, including but not limited to the costs incurred

for the Recalled Devices, the cost of their plan participants' medical care arising out of

the use of the defective Recalled Devices, and to recover any and all consequential

damages recoverable under the law including, but not limited to both past and future

medical expenses for which Plaintiff and the other Nationwide Class members will be

responsible. Plaintiff, individually and on behalf of the other Nationwide Class members,

is entitled to seek compensatory damages, attorney's fees, injunctive and equitable relief,

and other remedies as determined by Minnesota law. Plaintiff's and the other Nationwide

Class members' claims are limited to damages incurred in association with the

reimbursement of medical expenses to those plan participants who have not settled

personal injury claims with Defendants.

**SEVENTH CLAIM FOR RELIEF**
**Misrepresentation by Omission**
**(On behalf of Plaintiff, the Nationwide Class, and the Alaska Class)**

222.    Plaintiff hereby incorporates by reference Paragraphs 1-156, as if fully set

forth herein.

223.    Under federal law, a medical device manufacturer has a continuing duty to

monitor the device after premarket approval and to discover and report to the FDA any

complaints or potential risks concerning the device's performance, and any adverse health

consequences, of  which it became aware and that are or may be attributable to the

product.

224.    St. Jude Medical, Inc. had notice as early as 2011, in the form of

information submitted to St. Jude Medical, Inc. by its supplier, that the Greatbatch

batteries used in its ICD and CRT-D devices were defective and could prematurely deplete as a result of a defect concerning lithium clusters.

225.    Between 2011 and 2014, St. Jude Medical, Inc. received 42 product analysis reports indicating that lithium cluster bridging could cause the batteries used in its ICD and CRT-D devices to prematurely deplete. Despite evidence that lithium clusters were the cause of the premature battery depletion, St. Jude Medical, Inc. represented that the cause of the depletion "could not be determined." St. Jude Medical, Inc. violated its continuing duty under federal law to investigate and report evidence that the Greatbatch batteries used in its ICD and CRT-D devices were defective and could prematurely deplete as a result of a defect.

226.    St. Jude Medical, Inc. knew or should have known that the Greatbatch batteries used in its ICR and CRT-D devices were defective and could prematurely deplete as a result of a defect, but failed to comply with federal laws and regulations that required St. Jude Medical, Inc. to report this information.

227.    St. Jude Medical, Inc. fraudulently, negligently, or recklessly concealed from or failed to disclose to, the FDA the Battery Depletion Defect in violation of the FDCA and federal regulations.

228.    Had St. Jude Medical, Inc. timely reported adverse events and potential risks associated with a defective battery to the FDA, they would have appeared on the FDA's MAUDE internet database and in medical journals, and/or the FDA would have investigated the reports and issued Safety Communications and a Class I recall prior to October 10, 2016. And as a result, physicians would have ceased recommending the

specific device be implanted in Plaintiff's and the other Nationwide and Alaska Class members' plan participants before October 10, 2016.

229.    As a direct and proximate result of St. Jude Medical, Inc.'s failure to warn, its defective devices continued to be sold and implanted in Plaintiff's and the other Nationwide and Alaska Class members' plan participants after it knew or should have known that these devices were associated with a serious undisclosed risk and were unsafe for their intended use.

230.    As a direct and proximate result of St. Jude Medical, Inc.'s failure to warn, Plaintiff's and the other Nationwide and Alaska Class members' plan participants have received related medical treatment and care and costs associated with assessment of the defective device, and replacement and installation of a new ICD or CRT-D device, which could have been avoided had Defendant properly notified the FDA in accordance with federal regulations and requirements. The costs of this additional medical treatment fell primarily on Plaintiff and the other Nationwide and Alaska Class members, who were required to cover the costs of the treatment and device replacement.

231.    As a direct and proximate result of St. Jude Medical, Inc.'s wrongful conduct, for which Defendants are liable, Plaintiff and the other Nationwide and Alaska Class members have been damaged in an amount to be determined at trial.

**EIGHTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On behalf of Plaintiff, the Nationwide Class, and the Alaska Class)**

232.    Plaintiff hereby incorporates by reference Paragraphs 1-156, as if fully set forth herein.

64

233.   This cause of action is alleged in the alternative to Plaintiff's warranty-based claims.

234.   To Plaintiff's and the other Nationwide and Alaska Class members' detriment, Defendants have been and continue to be unjustly enriched as a result of the wrongful collections of payments from Plaintiff and the other Nationwide and Alaska Class members for the purchase of the Recalled Devices.

235.   In exchange for the payments made for the Recalled Devices, and at the time they made these payments, Plaintiff and the other Nationwide and Alaska Class members expected that the Recalled Devices were safe, not defective, and medically effective treatment for the condition, disorder, or symptom for which they were prescribed.

236.   As an intended and expected result of the conscious wrongdoing as set forth in this Complaint based on its failure to comply with FDCA and federal regulations for the manufacture and reporting of its devices, Defendants have profited and benefited from payments Plaintiff and the other Nationwide and Alaska Class members made for the Recalled Devices with defective batteries.

237.   Defendants have voluntarily accepted and retained these payments with full knowledge and awareness that, as a result of its wrongdoing, Plaintiff and the other Nationwide and Alaska Class members paid for defective, Recalled Devices and have been or will be forced to pay for replacement devices when they otherwise would not have done so. Defendants have only offered to reimburse patients for out of pocket medical expenses related to medical treatment incurred as a result of the recall of its

defective ICD and CRT-D devices. Defendants' failure to provide Plaintiff and the other

Nationwide and Alaska Class members with the remuneration they expected unjustly

enriched Defendants.

238.    Plaintiff and the other Nationwide and Alaska Class members are entitled

in equity to seek restitution of Defendants' wrongful profits, revenues, and benefits to the

extent and in the amount deemed appropriate by the Court, and such other relief as the

Court deems just and proper to remedy Defendants' unjust enrichment.

239.    Accordingly, Plaintiff, individually and on behalf of the other Nationwide

and Alaska Class members, seeks full restitution of Defendants' enrichment, profits,

revenues, benefits and ill-gotten gains acquired as a result of the unlawful and/or

wrongful conduct alleged herein.

**NINTH CLAIM FOR RELIEF**
**Violation of Alaska Consumer Protection Act - AS §§ 45.50.471,** *et seq.*
**(On behalf of Plaintiff and the Alaska Class)**

240.    Plaintiff hereby incorporates by reference Paragraphs 1-156, as if fully set

forth herein.

241.    St. Jude Medical, Inc. deceptively omitted or misrepresented material

information regarding the Battery Depletion Defect and the safety of the Recalled

Devices, violating their duty to disclose under Federal requirements.

242.    Specifically, as alleged herein, St. Jude Medical, Inc. knew of the Battery

Depletion Defect as early as 2011, but failed to take action to investigate and report this

known risk, *instead waiting nearly five years before issuing a recall of the defective*

*devices*.

243. Despite the extensive evidence, and its clear knowledge of the premature battery depletion problem in its devices, St. Jude Medical, Inc. failed to take prompt action, and knowingly ignored or concealed this evidence from its management boards, from the FDA, and from the public, including Plaintiff and the other Nationwide and Alaska Class members.

244. In 2014, St. Jude Medical, Inc.'s management review and medical advisory boards were given two separate presentations on premature battery depletion. During these meetings, St. Jude Medical, Inc. failed to tell fully disclose the full scope of the battery issue, presented false or incomplete evidence of the defect, and concealed evidence of a known death related to this battery defect stating instead that there were no serious injuries or deaths directly related to lithium cluster bridging.

245. St. Jude Medical, Inc. also concealed the Battery Depletion Defect from the FDA, medical providers, TPPs, and patients for years, putting hundreds of thousands of its device users at severe risk. As a result, St. Jude Medical, Inc. allowed thousands more defective devices to be implanted in patients across the United States at the Nationwide and Alaska Class members' expense. Even today, St. Jude Medical, Inc.'s successors in interest refuse to pay for removal and replacement of the defective devices.

246. St. Jude Medical, Inc. ignored and concealed the Battery Depletion Defect for five years until, on information and belief, it was compelled to further investigate the issue by Abbott. As a result of the new 2016 investigations, lithium cluster bridging was finally identified as the root cause and a decision was made to recall the affected devices.

247.    Had St. Jude Medical, Inc. disclosed or accurately represented the defects in the Recalled Devices, physicians would not have used the Recalled Devices and the Recalled devices would not have been implanted in the Plaintiff's and the other Alaska Class members' plan participants. Accordingly, Plaintiff and the other Alaska Class members would not have incurred costs for the Recalled Devices and the medical costs for assessment of the Recalled Device or for device removal and replacement surgery and other related medical costs.

248.    By reason of St. Jude Medical, Inc.'s conduct alleged herein, and by inducing Plaintiff's and the other Alaska Class members' plan participants, and the plan participants' physicians to use the Recalled Devices, and inducing Plaintiff and the other Alaska Class members to pay for them, through the use of deception, fraud, false advertising, false pretenses, misrepresentations, omissions, unfair and/or deceptive practices and the concealment and suppression of material facts, including but not limited to fraudulent statements, concealments and misrepresentations identified herein and above in violation of federal laws and regulations, St. Jude Medical, Inc. engaged in unfair or deceptive acts and practices in the conduct of trade or commerce in violation of the Alaska Consumer Protection Act, Alaska Stat. §§ 45.50.471, *et seq.*

249.    As a direct and proximate result of St. Jude Medical, Inc.'s unlawful conduct, for which Defendants are liable, Plaintiff's and the other Alaska Class members' plan participants were implanted with a Recalled Device, which would not have occurred had Defendants not used unfair and/or deceptive practices and not omitted or concealed its knowledge of the Battery Depletion Defect.

250.    But-for St. Jude Medical, Inc. above-described unlawful conduct, Plaintiff and the other Alaska Class members would not have purchased the Recalled Devices and would not have incurred medical costs related to assessment or replacement of the Recalled Devices.

251.    By reason of such violations, and pursuant to the Alaska Consumer Protection Act, Plaintiff and the other Alaska Class members are entitled to recover damages, including but not limited to the cost of the Recalled Devices, the cost of their plan participants' medical care arising out of the use of the devices, and to recover any and all consequential damages recoverable under the law including, but not limited to both past and future medical expenses for which Plaintiff and the other Alaska Class members will be responsible. Plaintiff, individually and on behalf of the other Alaska Class members, is entitled to seek compensatory damages, attorney's fees, injunctive and equitable relief, and other remedies as determined by Alaska law.  Plaintiff's and the other Alaska Class members' claims are limited to damages incurred in association with the reimbursement of medical expenses to those plan participants who have not settled personal injury claims with Defendants.

## VII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Nationwide and Alaska Classes, respectfully requests that this Court enter judgment in its favor and against Defendants Abbott Laboratories and St. Jude Medical, LLC, as follows:

A.      Declaring that this action is a proper class action, certifying the Nationwide and Alaska Classes as requested herein, designating Plaintiff as Nationwide and Alaska Class Representative, and appointing Plaintiff's attorneys as Class Counsel;

B.      Declaring that Defendant Abbott is the alter ego of St. Jude Medical, LLC and St. Jude Medical, Inc.

C.      Declaring that Defendants are liable for St. Jude Medical, Inc.'s conduct alleged herein as de jure or de facto successors in interest.

D.      Enjoining Defendants from continuing the unfair business practices alleged in this Complaint;

E.      Ordering Defendants to pay actual and statutory damages (including punitive damages) and restitution to Plaintiff and the other Nationwide and Alaska Class members, as allowable by law;

F.      Ordering Defendants to pay the costs of medical monitoring, whether denominated as damages or in the form of equitable relief;

G.      Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

H.      Ordering Defendants to pay attorneys' fees and costs of suit; and

I.      Ordering such other and further relief as may be just and proper.

## VIII.   JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff, individually and on behalf of the other Nationwide and Alaska Class members, demands a trial by jury for all issues so triable.

Dated:  July 24, 2018                    **CHESTNUT CAMBRONNE PA**

By s/ Karl L. Cambronne
    Karl L. Cambronne, #14321
    Bryan L. Bleichner, #0326689
    Jeffrey D. Bores, #227699
    17 Washington Avenue North, Suite 300
    Minneapolis, Minnesota 55401
    Telephone:  612-339-7300
    kcambronne@chestnutcambronne.com
    bbleichner@chestnutcambronne.com
    jbores@chestnutcambronne.com


    Adam J. Levitt (*pro hac vice to be filed*)
    Amy E. Keller (*pro hac vice to be filed*)
    Adam Prom (*pro hac vice to be filed*)
    **DiCELLO LEVITT & CASEY LLC**
    Ten North Dearborn Street, Eleventh Floor
    Chicago, Illinois  60602
    Telephone: 312-214-7900
    alevitt@dlcfirm.com
    akeller@dlcfirm.com
    aprom@dlcfirm.com


    Kim D. Stephens (*pro hac vice to be filed*)
    Jason T. Dennett (*pro hac vice to be filed*)
    Cecily C. Shiel (*pro hac vice to be filed*)
    **TOUSLEY BRAIN STEPHENS PLLC**
    1700 Seventh Avenue, Suite 2200
    Seattle, Washington  98101
    Telephone:  206-682-5600
    kstephens@tousley.com
    jdennett@tousley.com
    cshiel@tousley.com

Robert K. Shelquist
Rebecca A. Peterson
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 220
Minneapolis, Minnesota  55401
Telephone: 612-339-6900
rkshelquist@locklaw.com
rapeterson@locklaw.com

*Counsel for Plaintiff and the Proposed
Nationwide and Alaska Classes*